**Lori M. GLEASON, Plaintiff–Appellant,**

v.

**MESIROW FINANCIAL, INCORPORATED, Defendant–Appellee.**

No. 96–1458.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 1996.

Decided June 25, 1997.

Francis M. Pawlak (argued), Nancy O'Brien–Kane, Schuyler, Roche & Zwirner, Chicago, IL, for Plaintiff–Appellant.

Robert H. Brown (argued), Clifford R. Perry, III, Jeffrey S. Fowler, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Chicago, IL, for Defendant–Appellee.

Before COFFEY, RIPPLE and EVANS, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiff-appellant Lori M. Gleason ("Gleason") was terminated from her employment with the defendant-appellee Mesirow Financial, Inc. ("Mesirow") on November 2, 1992, when she was seven months pregnant. Following her termination, Gleason filed a three-count complaint against Mesirow, claiming (1) pregnancy discrimination, (2) "hostile work environment" sexual harassment, and (3) retaliatory discharge, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* The district court granted summary judgment in

favor of the defendant on each count. Gleason appeals. We AFFIRM.

## I. BACKGROUND

Mesirow is a financial services firm that provides, *inter alia*, execution and clearing services on various securities exchanges for brokers/dealers who are not members of any of the national exchanges. The events in this case transpired at the firm's main office in Chicago, Illinois. In May 1991, the defendant-appellee hired Gleason as a systems operator phone clerk at its Correspondent Trading Desk ("the desk"), a position that required her to accept and accurately process orders for various securities transactions. Brokers/dealers would place such orders by telephone or by computer, and a phone clerk would then record the transaction in writing and transmit the order *via* computer or telephone to the appropriate exchange (e.g., the New York Stock Exchange or the Chicago Board of Options Exchange) for execution.

Greg Novak, hired in February 1992 to be the manager of the desk, supervised Gleason and the half-dozen other employees at the desk, but he had no authority to hire, fire, or promote any personnel. As the district court observed, "Novak's abrasive management style ... was not calculated to win friends and influence people—nor did it. Novak's overbearing behavior—yelling, slamming down the phone, making nasty comments about clients, talking down to his fellow workers—was the source of complaints to higher levels of management *by both male and female co-workers*." (emphasis added). Cassandra Armstrong, who worked with the plaintiff at the desk, found Novak "overpowering," "hyper," "unsettled," "jumpy," and "irritable." Likewise, Gleason's co-worker David Garcia referred to Novak as "generally offensive to employees and customers," "overbearing," "unprofessional," and "a jerk."

Gleason was among those who complained to management concerning Novak's generally obnoxious conduct and difficult personality, but as far as the record reveals neither Gleason nor anyone else at the desk ever raised *specific* concerns or allegations of sexual harassment by Novak. Four to six weeks after Novak became manager of the desk, a group of six desk employees (male and female) held a meeting with Novak to discuss objections to his management style. Armstrong was chosen to be the spokesperson for the group. She recalls "the gist of [the meeting] was that ... we felt ... uncomfortable [about] how he treated each of us." All of those present, including the plaintiff, had an opportunity to air their grievances. It was suggested to Novak that some of his behavior (yelling, slamming down phones) may have been acceptable in his previous position while working on the floor of a busy stock exchange, but was not considered appropriate in the more sedate and professional surroundings at Mesirow. When Novak, even after this "gripe session," persisted in "yelling and screaming and talking down to his fellow workers," Armstrong and Gleason asked to meet with William McGowan (a Senior Vice President with responsibility for the operations of the desk) concerning Novak. Armstrong and Gleason complained about Novak's being "out of line," re-iterating the concerns they and their co-workers had voiced at the earlier meeting with Novak. In Gleason's own words, they spoke of Novak's behavior "on a *general* basis," but she admitted that she did not use the term "sexual harassment" nor did she describe his conduct as being of a sexually harassing nature. Furthermore, neither Armstrong nor McGowan (the other two individuals present at this meeting) recalled any discussion of sexual harassment. In short, if Gleason had *specific* concerns about sexual harassment, she kept them to herself during the meetings with Novak and McGowan. Gleason likewise failed to utilize the complaint procedures clearly set forth in the company's sexual harassment policy, which was included in an employee handbook provided to her. The policy stated that "[a]ny employee who believes that he or she has been sexually harassed should immediately bring the matter to the attention of his or her manager, or the Human Resources Department." The policy further explained that Mesirow would investigate such complaints thoroughly and, "to the extent possible," treat them as "strictly confidential."

Although Gleason failed to raise any charges of sexual harassment while she was in the defendant's employ, in this lawsuit she alleges in some detail that Novak sexually harassed her between February and November 1992. Gleason claims that Novak: (1) flirted with her cousin (not a Mesirow employee) when she visited the office, (2) flirted with her sister over the telephone, (3) told co-workers that some female customers were "bitchy," "dumb," or suffering from "PMS", (4) spoke to another female employee about the size of her breasts,[1] (5) told another female employee that he liked her in tighter skirts, and (6) stood up at his desk to "ogle" women as they walked by. According to Gleason, Novak once placed an advertisement for a nudist colony on her desk and informed her that he had spent the weekend there (he had). On another occasion, Novak allegedly told Gleason, tearfully, that he had dreamt about holding hands with her.

Gleason also claims that Novak made a number of improper and allegedly discriminatory comments regarding her pregnancy. According to Gleason, Novak (1) repeatedly suggested that she ought to get a special shield for her computer screen to protect the baby from radiation emitted by the screen, (2) stated that he hoped the baby's father would support the child (Gleason was a single mother), (3) shouted out "God bless you, God bless you" upon hearing about her pregnancy, (4) asked about dietary and/or alcohol restrictions on account of the pregnancy, and (5) said that he would be willing to give her advice on "single parenting," based upon his own experience as a single father. Gleason claims that Novak persisted in commenting on her pregnancy even after she requested that he stop.

On November 2, 1992, more than a year after she was hired as a phone clerk, Gleason incorrectly processed a stock trade "sell" order and failed to report the error immediately, as required by established office protocol. Instead of promptly informing her manager, Novak, who was sitting adjacent to her at the time of the mistake, the plaintiff attempted to correct the error on her own, contrary to company policy.[2] According to her superiors, the misstep, coupled with Gleason's failure to follow the proper procedures, ended up costing the financial services firm approximately $24,000. *The plaintiff does not dispute that she was responsible for the trading error, nor does she challenge Mesirow's position that her conduct resulted in a loss of approximately $24,000. At the time she made this costly slip-up, Gleason had previously been put "on notice" from her employer that they would no longer tolerate such mistakes, for she had been admonished in early October concerning an error that had cost her employer $1,750.*[3] Moreover, during the very month prior to her dismissal, Gleason was in attendance at two separate meetings (on October 16 and October 19) at which desk employees were informed that clerical errors would not be tolerated, and expressly warned that a sizable error, coupled with the failure to follow established procedures,[4]

---

1. Contrary to Gleason's allegations, the employee in question, a Ms. Leuchtner, did not recall any incident in which her anatomy was the subject of comment by Novak.

2. To use industry jargon, she attempted to "bust" the trade.

3. A November 9, 1992 memorandum from McGowan to Dale Swanson, Mesirow's Vice President of Human Resources, states that Gleason was warned, in late September, "regarding her attendance and tardiness" and "informed ... that she must improve both of these performance issues or face further disciplinary action in the form of a written warning or dismissal." In his deposition, McGowan did not recall that Gleason had a problem with attendance (i.e., absenteeism), but he did note her lack of punctuality in arriving at work. Although phone clerks were expected to report to the trading desk promptly at 7:45 AM, McGowan testified that Gleason "quite frequently" did not arrive until "well after 8:00," which disrupted the operations of the trading desk and frequently "put[ ] a burden on the other members of the desk."

4. Although Gleason maintains that Mesirow did not have well-established office procedures for dealing with trading errors, the plaintiff admits, in her own deposition testimony, that there was "probably" a discussion, at one or both of the trading desk meetings in October, concerning the need to inform Novak immediately about trading errors. The deposition testimony of at least four other Mesirow employees also supports Mesirow's claim that trading desk employees knew that they were supposed to inform their managers immediately in the event of an error.

would be grounds for dismissal. Gleason claims not to remember much of what was said during these meetings, but she did admit in her deposition testimony that she took notes during one of these meetings, and that inscribed thereon is the unambiguous statement "larger errors equals [sic] grounds for dismissal."

Gleason was the desk employee with the highest dollar-amount of errors during the time frame from February to November 1992 (approximately $29,000) and the employee with the second largest number of trading errors for that period. Following Gleason, the next most "expensive" employee at the desk had incurred losses amounting to just $10,000. Yet another employee had slightly more individual errors than Gleason (23 versus her 20), but this employee's total losses only amounted to approximately $3,000.

In light of Gleason's significant and costly mistakes in processing phone orders, and her failure to follow established verification and correction procedures, McGowan decided to dismiss Gleason from her phone clerk position, and informed her on the evening of November 2. *Novak, whose position gave him no authority to make personnel decisions regarding any Mesirow employees, did not participate in the decision to terminate Gleason.* In fact, when McGowan asked Novak for his opinion on the matter, the only response Novak gave was: "It's not my call." Before terminating Gleason, McGowan conferred with the President of the company, James Tyree, and Ruth Hannenberg, the firm's Managing Director/ Chief Administrative Officer (who was nine months pregnant at the time). McGowan's decision to terminate Gleason was made with "substantial input and concurrence" from Hannenberg, who has described her consultation with McGowan as follows:

At the time Mr. McGowan and I were considering Ms. Gleason's termination, one of our concerns was the hardship it might cause her during her pregnancy. We considered whether we would *not* terminate her just because of her pregnant status. We decided that her offenses were so serious that we should not change our decision

to terminate her just because she was pregnant. However, we wanted to moderate the impact of the termination upon her. Therefore, we decided that Mesirow would pay for health insurance premium[s] through the month that her baby was born. We would not be otherwise obligated to pay for a premium for a terminated employee. . . . We did pay Ms. Gleason's health insurance premium through the month the baby was born.

As noted above, Gleason never did make any written or verbal allegations of sexual harassment by Novak at any time while employed and prior to her discharge, despite the fact that her employer had clearly published procedures (set forth in its employee handbook) for reporting such misconduct. Mesirow first learned of the alleged sexual harassment by Novak about six weeks following Gleason's termination, in a letter dated December 14, 1992 from the plaintiff's attorney. Upon receipt of this letter, the company retained outside counsel to investigate Gleason's allegations. In spite of the fact that this inquiry concluded that Novak had not engaged in sexual harassment, Novak was verbally reprimanded by Tyree and warned that if he did not alter his management style, which had been referred to by his subordinates as "crude, boorish . . . , and obnoxious," he would be terminated forthwith. Employees at the desk were informed about the results of the investigation and Novak was ordered to (and did) apologize for his past behavior.

In early 1993, Gleason filed a charge of sex discrimination against defendant-appellee Mesirow, Novak, and McGowan with the Equal Employment Opportunity Commission ("EEOC"). After obtaining a right-to-sue letter from the EEOC in July 1993, Gleason filed her complaint in the district court, alleging that (1) Mesirow terminated her because of her pregnancy, (2) defendants sexually harassed her, and (3) Mesirow terminated her in retaliation for complaining about Novak. Early in 1994, the district court dismissed the defendants Novak and McGowan, leaving Mesirow as the sole defendant.[5] On

---

5. The ruling dismissing Novak and McGowan as defendants is not contested in this appeal.

September 18, 1995, following extensive discovery, the district judge granted Mesirow's motion for summary judgment with respect to the plaintiff's three Title VII claims. The plaintiff-appellant appealed.

## II. ISSUES

Gleason asserts that the trial judge improperly granted summary judgment in favor of the defendant Mesirow Financial, Inc. with respect to her Title VII claims, to wit (1) pregnancy discrimination, (2) "hostile work environment" sexual harassment, and (3) retaliatory discharge.

## III. DISCUSSION

### 1. *Standard of Review*

Summary judgment is proper if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "We review *de novo* a district court's grant of summary judgment, viewing the record in the light most favorable to the nonmoving party." *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir.1994) (citation omitted). "Summary judgment is appropriately entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 479 (7th Cir.1996) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). "Only when we determine that no reasonable factfinder could decide for the nonmoving party is summary judgment appropriate." *Id.*

In order to successfully oppose a motion for summary judgment, the nonmoving party (in this case, Gleason) must do more than raise a "metaphysical doubt" as to the material facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Rather, she "must come forward with 'specific facts showing that there is a *genuine issue for trial.'*" *Id.* at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)). "Where the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* Finally, "[a]lthough we must, for purposes of summary judgment review, draw any inferences from the record in favor of [the plaintiff], we are not required to draw every conceivable inference from the record. We need draw only reasonable ones." *Tyler v. Runyon*, 70 F.3d 458, 467 (7th Cir.1995) (quotation omitted).

### 2. *Pregnancy Discrimination*

Title VII provides that it is "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a). In 1978, Congress passed the Pregnancy Discrimination Act ("PDA"), which amended Title VII to make clear that "[t]he terms 'because of sex' and 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by *pregnancy,* childbirth, or related medical conditions shall be treated the same for all employment purposes." Pub. L. No. 95–555, 92 Stat. 445 (codified as amended at 42 U.S.C. § 2000e(k)) (emphasis added). Thus, discrimination on the basis of pregnancy is an unlawful employment practice under Title VII.

We begin by observing that Title VII, as amended by the PDA, "does not protect [a pregnant employee] from being fired without good cause. It protects [her] from being fired because of [her pregnancy]." *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 657 (7th Cir.1991) (en banc). As this court has stated, the federal anti-discrimination laws do not authorize judges to "sit as a kind of 'super-personnel department' weighing the prudence of employment decisions...." *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997) (citations omitted).

We explained recently in *Geier v. Medtronic, Inc.*, 99 F.3d 238 (7th Cir.1996), that

there are two ways for a plaintiff to establish pregnancy discrimination: the first is the so-called "mixed motives" approach, while the second is the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).[6]

Congress codified the "mixed motives" approach in 1991 when it amended Title VII to state that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex [pregnancy], or national origin was a motivating factor for any employment practice, *even though other factors also motivated the practice.*" 42 U.S.C. § 2000e-2(m) (emphasis added). Under the mixed motives approach, the plaintiff may rely upon either direct or circumstantial evidence to establish discriminatory intent. *Geier*, 99 F.3d at 241. However, "[o]nce a plaintiff shows that an employment decision was motivated in part by her pregnancy, the defendant may avoid a finding of liability by proving that it would have made the same decision had the plaintiff not been pregnant." *Id.* (citing *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir.1994)).

■ We are convinced that the evidence in this record is insufficient for a reasonable trier of fact to conclude that Gleason's termination was motivated, *even in part*, by the fact that she was pregnant. McGowan, who made the decision to terminate Gleason, allegedly congratulated Gleason when he first learned of her pregnancy, commenting that he had suspected she was pregnant because her breasts had become larger. We agree with the district judge that McGowan's remark was "perhaps not the most tactful response," indeed in our opinion it was uncalled-for, vulgar, and boorish. Nevertheless, even though "awkward [and] insensitive," this remark does not necessarily "rise to the level of direct evidence

of discrimination." *Geier*, 99 F.3d at 242. "To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision-making process." *Id.* Gleason has failed to demonstrate any "causal nexus" between McGowan's isolated remark[7] and the decision to discharge her (made immediately following her costly November 2 trading error). *Id.*

■ As for Novak's pregnancy-related comments,[8] we likewise hold that these remarks—while gratuitous, unnecessary, and at best ill-advised-do not demonstrate bias against pregnant women. Rather, in the words of the trial judge, they show "a concern, however indelicately put, at Ms. Gleason's delicate condition." Novak's comments may have been unwelcome and inappropriate, but they do not reveal an animus based on either the plaintiff's sex or her pregnant condition, as required under our case law in order to be actionable under Title VII. Most importantly, however, there is not even arguably a "causal link" between Novak's supposed bias against pregnant women and the plaintiff's termination, *for Novak did not participate in the decision to terminate Gleason.* Thus, Novak's comments with regard to Gleason's pregnancy are essentially irrelevant to the question of whether pregnancy was a factor in the plaintiff's termination. *See, e.g., LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1412 (7th Cir.1984) (inquiry should focus on motivation of individual who actually made decision to terminate plaintiff, not on the alleged statements of lower-level managers).

■ In support of her "mixed motives" pregnancy discrimination claim, Gleason attempts to demonstrate that her employer was biased against pregnant women with the introduction of affidavits by two other Mesirow employees, Jo Ann Suttie and Margaret King, who claim that they believe they were

---

6. The parties disagree about whether this is a "mixed motives" case or a *McDonnell-Douglas* burden-shifting case. We find the dispute immaterial, for under either approach, as explained below, we are persuaded that the plaintiff has failed to establish pregnancy discrimination.

7. The plaintiff concedes that this remark was not made contemporaneously with her termination but as much as three months earlier.

8. I.e., his comments regarding a computer screen to protect the baby, inquiries about her diet and whether the father of the child would help out, *et cetera.*

treated unfairly by the company in connection with their respective pregnancies. As this court noted recently in an age discrimination case, citing to but a few scattered examples of alleged discrimination by an employer will not suffice to establish that the employer is biased:

> Everyone could point to a comparison that would make [the defendant] look bad, but the exercise would not show that age [or, here, pregnancy] played a role. A plaintiff who wants a court to infer discrimination from the employer's treatment of comparable cases has to analyze a goodly sample. One is an anecdote, and several cases are several anecdotes. Judges do not find discrimination on such a thin basis. What a plaintiff ... has to do is subject all of the employer's decisions to statistical analysis to find out whether age [pregnancy] makes a difference. Our opinions emphasize the need to go beyond a few comparison cases, and we cannot stress this point enough.

*Kuhn v. Ball State*, 78 F.3d 330, 332 (7th Cir.1996) (citations omitted).

The relevance of the 1989 incident involving Jo Ann Suttie is, at best, questionable. Suttie's allegations (as set forth in her affidavit) are hardly trivial,[9] but they fall short of establishing that the decisionmakers who terminated Gleason in 1992 (McGowan, Hannenberg, Tyree) had a bias against pregnant women. Suttie worked in a *separate* department under the supervision of *different* individuals. Neither Novak nor McGowan were even working for Mesirow at the time of Suttie's termination, and Suttie's affidavit makes no mention of Tyree or Hannenberg, the two individuals with whom McGowan consulted before discharging Gleason. As for Margaret King, we do not agree with the plaintiff (based on the limited information set forth in King's affidavit) that King suffered unfair treatment on account of her pregnancy. King avers that she returned from maternity leave in 1993 to find that her position as a "trading assistant" had been "eliminated due to a reorganization." Although King

states in her affidavit that she was troubled by this change of status, she admits that Mesirow offered her a position as a sales assistant, with no reduction in salary (she left the firm voluntarily six months later).

In reviewing a district court's grant of summary judgment, we must evaluate the record "as a whole." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. Therefore, in addition to the supposed "evidence" of pregnancy discrimination cited by Gleason (McGowan's statement about her breast-size, Novak's pregnancy-related comments, and the Suttie/ King incidents), we must also consider any facts in the record which serve to establish that her employer was *not* biased against pregnant women and, specifically, evidence which demonstrates that bias *did not* play a role in the decision to terminate Gleason. Ruth Hannenberg, who had "substantial" input into the termination decision, was herself nine months pregnant at the time of Gleason's dismissal. According to Hannenberg, she and McGowan did discuss the plaintiff's pregnancy—not as a reason for terminating Gleason—but rather as a possible argument *against* discharging her. The plaintiff's pregnancy did not deter McGowan and Hannenberg from taking the action they deemed necessary for the good of the company (dismissing Gleason), but at the same time they went out of their way to arrange for the firm to pay Ms. Gleason's health insurance premiums through the delivery of Gleason's child, even though the firm was under no legal, moral or contractual obligation to provide this benefit. There are other examples in the record demonstrating that Mesirow's treatment of pregnant employees was both fair and proper: (1) Leuchtner, who also worked for Novak and McGowan, was given maternity leave and promoted upon her return to work, (2) Mesirow bond-trader Donna Borza—about to take a second pregnancy leave at the time she was deposed in this case—testified that her employer had treated her "very well" and "great" in connection

---

9. In her affidavit, Suttie claims that she was terminated during her pregnancy leave and that during her exit interview, an individual named Steve Gaber informed her that she was being dismissed because Mesirow "couldn't have women with two children trading bonds." According to Suttie, Gaber had previously told her that the firm should not "hire anyone in their childbirth years."

with both of her pregnancies, (3) the company had a short-term disability leave policy that provided benefits for women who took pregnancy leave (employees received 60% of their salary for up to 90 days), and (4) the majority of employees who took pregnancy leave, according to Hannenberg's testimony, returned to the positions they occupied before taking leave (or to substantially equivalent positions), or were even promoted upon their return.

We believe that summary judgment in favor of Mesirow was proper and are of the opinion that no reasonable factfinder, based on the record before us, could find that pregnancy played a role in the decision to terminate Gleason. Thus, the plaintiff has failed in her attempt to establish pregnancy discrimination under the "mixed motives" approach.

A second way of establishing pregnancy discrimination is to utilize the burden-shifting or "indirect" method of proof set forth in *McDonnell Douglas*. This approach:

> shifts the burden of production to the defendant, once a plaintiff establishes a *prima facie* case of discrimination. To make a *prima facie* case, a plaintiff must show that she was (1) a member of a protected class, (2) qualified for her position and (3) discharged, and (4) that others, similarly situated but not of the protected class, were treated more favorably. Once a *prima facie* case is established, the defendant must come forward with a legitimate, nondiscriminatory reason for plaintiff's treatment to avoid liability. The plaintiff then has an opportunity to prove that the proffered explanation is pretextual.

*Geier*, 99 F.3d at 242 (citations omitted).

■ Gleason has failed to establish even a *prima facie* case of pregnancy discrimination, for it is apparent in light of her previous trading errors that she was not "qualified for her position." *Id.* In the two-month period prior to November 2, McGowan had reprimanded Gleason for a "sloppy, unacceptable" mistake that cost her employer $1,750, and also for "tardiness," i.e., arriving to work late "quite frequently." We think it is clear that Gleason has failed to establish a *prima facie* case of pregnancy discrimination because

"her job performance failed to meet [Mesirow's] legitimate expectations." *Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 336 (7th Cir.1993). Even assuming, *arguendo*, that Gleason *has* established a *prima facie* case of pregnancy discrimination, we are convinced that the defendant-appellee has presented legitimate, non-discriminatory and most persuasive reasons for terminating Gleason. At two separate meetings in October of 1992 (one month prior to the plaintiff's termination), Gleason's superiors made it abundantly clear to all desk employees that sizable trading errors (and/or the failure to follow established procedures for dealing with the same) would be grounds for dismissal. Gleason even admitted that she had recorded the notation "larger errors equals [sic] grounds for dismissal" at one of these meetings. The plaintiff also had been individually cautioned about errors of this nature in early October of 1992, after incorrectly processing an order and causing a loss to the firm in the amount of $1,750. Despite these warnings, Gleason made another significant error about a month later and went so far as to compound the problem by attempting to correct the mistake on her own. Gleason may well have been reluctant to report the mistake to her superiors immediately, as she was supposed to do, because she feared disciplinary action or even termination in light of the previous warnings she had been given. As noted, Gleason also led the desk in trading errors (her twenty mistakes during the period from February to November 1992 cost Mesirow approximately $29,000). In making a reasoned business judgment about whether to continue Gleason in her present employment status, McGowan, Tyree, and Hannenberg had to consider—not just her past mistakes—but also the risk that a future trading error by Gleason might cost the firm even larger sums of money (as much as a million dollars, according to McGowan). We think it is obvious, in light of all the foregoing, that Gleason's employer had more than a legitimate, job-related, and non-discriminatory reason for terminating her.

■ Finally, even if we give Gleason the benefit of the doubt and assume that her claim survives the initial stages of the

*McDonnell Douglas* burden-shifting analysis, we hold that Gleason has failed to make a showing sufficient to demonstrate that the defendant's reasons for terminating her were a "pretext" for pregnancy discrimination. "A pretext, in employment law, is a 'phony reason' that the employer offers for engaging in discriminatory conduct." *Mills v. First Federal Savings & Loan*, 83 F.3d 833, 845 (7th Cir.1996). In the summary judgment context, "the ultimate burden is on [the plaintiff] to show that there is some genuine issue [of fact] as to whether the stated reasons form a pretext for ... discrimination." *Tyler v. Runyon*, 70 F.3d 458, 467 (quotation omitted). "The plaintiff can accomplish this by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Id.* "The plaintiff may show that the defendant's proffered reasons are incredible by showing that (1) they have no basis in fact, or (2) they did not actually motivate the employer's decision, or (3) they were insufficient to motivate the discharge." *Samuelson v. Durkee*, 976 F.2d 1111, 1114 (7th Cir.1992). According to Gleason, pretext is demonstrated by the fact that other, non-pregnant employees who worked at the desk during her period of employment also made trading errors but were not discharged. We reject this argument for the simple reason that none of the other employees' errors at the desk even approached the magnitude of those made by Gleason. When Gleason was discharged following her missteps of November 2, Mesirow was simply carrying out its previous warnings that sizable mistakes in processing orders and/or the failure to follow office procedures would be grounds for dismissal. We are aware of no evidence in the record, nor has the plaintiff brought any to our attention, which establishes that Mesirow merely used its concern with trading errors as a pretext or an after-the-fact rationalization for terminating Gleason. In other words, the plaintiff has failed to meet her burden of demonstrating pretext because the record is barren of *any* evidence which could lead a trier of fact to find either that Mesirow's proffered reasons for terminating her are "unworthy of credence," or

that a discriminatory reason more likely motivated the decision.

With regard to the plaintiff's pregnancy discrimination claim, we affirm the grant of summary judgment in favor of the defendant because we are convinced that Gleason failed to establish her claim under either the "mixed motives" approach or the *McDonnell Douglas* burden-shifting method of proof.

### 3. *Hostile Work Environment*

The plaintiff-appellant Gleason claims that she was a victim of "hostile work environment" sexual harassment during the time that Novak was her supervisor at the desk, and argues that she has come forward with sufficient evidence to withstand summary judgment on this claim. It is well established that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). However, "isolated and/or trivial remarks of a sexual nature do not satisfy the definition of sexual harassment." *Rennie v. Dalton*, 3 F.3d 1100, 1107 (7th Cir.1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994). "[F]or sexual harassment to be actionable, it must be sufficiently *severe or pervasive* to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405 (quotation omitted) (emphasis added). "[O]nly if the court concludes that the conduct would adversely affect the work performance and the well-being of *both* a reasonable person *and* the particular plaintiff bringing the action may it find that the defendant has violated the plaintiff's rights under Title VII." *Brooms v. Regal Tube Co.*, 881 F.2d 412, 419 (7th Cir.1989); *see also Saxton v. American Telephone & Telegraph Co.*, 10 F.3d 526, 534 (7th Cir.1993) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20–21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.... [W]hile psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Harris*, 510 U.S. at 23, 114 S.Ct. at 371.

When analyzing the question of whether Novak's alleged conduct transformed the Mesirow trading desk into a sexually "hostile work environment" for purposes of Title VII, the district judge relied primarily upon this court's decision in *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428 (7th Cir.1995). In *Baskerville*, a unanimous panel of this court recognized that it is often difficult to discern the "'line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing.'" *Id.* at 431 (quoting *Carr v. Allison Gas Turbine Div.*, 32 F.3d 1007, 1009–10 (7th Cir.1994)). Nevertheless, it is critical, in sexual harassment cases, to distinguish between "a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other." *Id.* Title VII, we held in *Baskerville*, was "not designed to purge the workplace of vulgarity," for a certain amount of "vulgar banter, tinged with sexual innuendo" is inevitable in the modern workplace, particularly from "coarse and boorish workers" such as Novak. *Id.* at 430–31. Our specific holding in *Baskerville* was that the plaintiff's supervisor had *not* engaged in actionable sexual harassment even though, over a seven-month period, he was guilty of the following: (1) called the plaintiff a "pretty girl," (2) made grunting sounds when the plaintiff wore a leather skirt, (3) said to the plaintiff that his office was not hot "until you walked in here," (4) stated that a public address announcement asking for everyone's attention meant that "all pretty girls [should] run around naked," and (5) alluded to his wife's absence from town and his loneliness, stating that he had only his pillow for company while making an obscene gesture. 50 F.3d at 430–31.

█ The central teaching of the *Baskerville* opinion-that "low-level harassment" is not actionable—was recently re-affirmed by another panel of this court in *Galloway v.*

*General Motors*, 78 F.3d 1164, 1168 (7th Cir. 1996). Thus, it is established in this circuit as of this date that there is a "safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a *reasonable* person believe that she has been discriminated against on the basis of sex." *Id.*; *see also Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 336–37 (7th Cir.1993) (no actionable harassment although plaintiff's supervisor jokingly called her a "dumb blonde," placed his hand on her shoulder several times, placed "I love you" signs in her work area, attempted to kiss her, and asked her out on dates).

The trial judge in the case before us properly used *Baskerville* as a yardstick for determining whether Novak's conduct amounted to actionable sexual harassment, and we agree with his conclusion that Novak's alleged actions were "actually less egregious than those reported in *Baskerville*," i.e., "experienced mainly secondhand," "less overtly sexual or gender-abusive," and "spread out over a longer period of time."

█ We observe, initially, that many of the alleged incidents of harassment cited by Gleason did not involve the plaintiff personally but rather female customers, Gleason's female relatives when they visited or called the office, or other female employees. Such incidents—directed at others and not the plaintiff—do have some relevance in demonstrating the existence of a hostile work environment. *See, e.g., Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir.1995); *Hall v. Gus Const. Co., Inc.*, 842 F.2d 1010, 1015 (8th Cir.1988). However, as this court has recognized, the impact of "second-hand harassment" is obviously not as great as the impact of harassment directed at the plaintiff. *See, e.g. Dalton*, 3 F.3d at 1107 (rejecting sexual harassment claim, in part, because neither of the two verbal communications cited by the plaintiff as evidence of a "hostile work environment" were "directed at her personally."). According to the plaintiff, Novak referred to female customers as "bitchy" or "dumb," on occasion appeared to be ogling other female employees, flirted with Gleason's female relatives, and allegedly

commented on the anatomy of one of Gleason's co-workers (as noted above, this individual did not recall such a remark). This conduct, though it was directed at other women, allegedly took place in Gleason's presence at the desk. This kind of off-color, juvenile and inappropriate behavior no doubt contributed to the desk's perception of Novak as a "jerk." But the question is whether Gleason, particularly when this alleged behavior was directed at others and not herself, could "rationally consider herself at a disadvantage in relation to her male co-workers by virtue of being a woman." *Galloway*, 78 F.3d at 1168. We do not believe that a reasonable person in the plaintiff's circumstances would conclude that she was at a disadvantage vis a vis her male coworkers because of her sex, particularly as the record reveals that both male *and* female employees at the desk objected to Novak's overbearing and abusive manner and his "talking down" to desk employees. In other words, there may very well have been a *hostile* work environment for both sexes in Novak's department. However, that environment was not more hostile for women than for men. As this court has remarked, "Title VII is not directed against unpleasantness *per se* but only . . . against discrimination in the conditions of employment." *Carr*, 32 F.3d at 1009.

Excluding Novak's pregnancy-related comments (which we have previously determined were nondiscriminatory) there are but two incidents which the plaintiff would have us believe amounted to sexual harassment. On one occasion, Novak told the plaintiff that he had spent the weekend at a nudist camp (he had, in fact, done so). In a separate, unrelated exchange, Novak related (with tears in his eyes) that he had dreamt of holding hands with Gleason. We do not agree with Gleason that either of the examples she cites could reasonably be construed as sexual harassment (nudism, while usually not an accepted topic of conversation in an office setting, is not sexual *per se*). Novak's behavior in these instances was certainly odd, and if these events transpired as Gleason claims, we can sympathize with her for "hav[ing] such a silly man as [her] boss." *Baskerville*, 50 F.3d at 431. However, neither of Novak's alleged remarks approach the level of offensiveness displayed by the alleged harasser in *Baskerville*, whose conduct, according to this court, did not rise to the level of sexual harassment even though he had allegedly commented, *inter alia*, that he was lonely and had only his pillow for company, while making an obscene gesture. Similarly, Novak's comments were nowhere near as objectionable as those in *Galloway*, where we held that there was no actionable harassment even though a coworker had referred to the plaintiff repeatedly as a "sick bitch." 78 F.3d 1164 (holding that "sick bitch" comments, understood in context, were not discriminatory and fell within the "safe harbor" created by *Baskerville*).

Finally, as in *Baskerville*, we think it important to take into account what Novak did *not* do. As far as the record reveals, Novak:

> never touched the plaintiff. He did not invite her, explicitly or by implication, to have sex with him. He made no threats. He did not expose himself, or show her dirty pictures. He never said anything to her that could not be repeated on prime-time television.

*Baskerville*, 50 F.3d at 431.[10]

Considering the "totality of the circumstances," *Harris*, 510 U.S. at 22–23, 114 S.Ct. at 371, as well as the definition of sexual harassment adopted by this court in *Baskerville* and *Galloway*, we are not persuaded that Novak's alleged conduct, *objectively* speaking, rose to the level of actionable sexual harassment. Although it is sufficient (for purposes of affirming summary judgment) to find that Novak's alleged conduct did not satisfy the "objective" component of the definition of sexual harassment, we also reject Gleason's claim that she *subjectively* experienced a sexually hostile work environment. Novak's alleged sexual harassment was not troubling enough to Gleason that she bothered to report it to any of her superiors, even though she was given ample opportunity to

---

10. Nor is there any allegation of so-called *quid pro quo* harassment in this case, i.e., a "situation[] where submission to sexual demands [was] made a condition of tangible employment benefits." *Bryson v. Chicago State University*, 96 F.3d 912, 915 (7th Cir.1996).

do so. *Compare Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1454 (7th Cir.1994) (complaints to supervisors plus the keeping of a contemporaneous log of the harasser's conduct was "sufficient to create a factual issue on the question of whether [plaintiff] *subjectively* perceived her work environment to be hostile and abusive."). Moreover, as evidenced by Gleason's own frequent use of obscene expletives on occasion, it is clear that Gleason is not a thin-skinned individual, much less "a woman of Victorian delicacy . . . mysteriously aloof from contemporary American culture in all its sex-saturated vulgarity" who would realistically have found Novak's comments "substantially . . . distressing." *Baskerville*, 50 F.3d at 431. Gleason failed to display either the judgment or the refinements in the language she used expected of an individual acting in her position. The record reflects that she used the infamous four-letter word (or some variation thereof) a number of times in a phone conversation after the November 2nd trading error. The defendant-appellee correctly describes Gleason's use of the phrase "I'm fucked" in this conversation as a "contemporaneous acknowledgment of Mesirow's probable and justifiable reaction to her serious [trading] mistakes."

To summarize this portion of our opinion, we agree with the district judge that the incidents cited by Gleason do not rise to the level of actionable sexual harassment, as defined in our case law. Based upon the record before us, we are in agreement with the trial judge's granting of summary judgment in favor of the defendant with respect to the plaintiff's "hostile work environment" sexual harassment claim.[11]

11. Because we agree with the district judge that Novak's alleged conduct did not rise to the level of sexual harassment, we need not address the issue of what legal standard should be used to determine Mesirow's liability for the conduct of Novak (i.e., the negligence standard applied by the district judge or the strict liability standard advocated by the plaintiff). Nevertheless, we concur with the trial judge's reasoning that Mesirow cannot be held liable under a negligence standard, for it had no knowledge of Novak's alleged harassment until *after* Gleason's termination. *Juarez v. Ameritech Mobile Communica-*

### 4. Retaliatory Discharge

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he [or she] has opposed any practice made an unlawful employment practice [by Title VII]." 42 U.S.C. § 2000e–3(a). As with other Title VII claims, a claim of retaliation is examined using the "familiar *McDonnell Douglas* burden shifting analysis." *McKenzie*, 92 F.3d at 483. Applying this mode of analysis, if Gleason establishes a prima facie case of retaliation, the burden of production then shifts to Mesirow to "come forward with a legitimate, non-retaliatory reason for its actions." *Id.* If the defendant rebuts Gleason's *prima facie* case in this manner, however, the burden shifts back to the plaintiff to demonstrate that her employer's proffered reasons for terminating her were pretextual. *Id.*

To establish a *prima facie* case of retaliation under Title VII, Gleason must establish that (1) she engaged in what our case law refers to as "statutorily protected expression" (i.e., reporting or otherwise opposing conduct prohibited by Title VII, such as sexual harassment), (2) she suffered an adverse, job-related action by her employer (in this case, termination), and (3) there is causal link between her opposition to unlawful discrimination and her termination. *Id.*; *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir.1989). "In order to demonstrate the 'causal link,' [Gleason] must demonstrate that [Mesirow] would not have taken the adverse action 'but for' the protected expression." *McKenzie*, 92 F.3d at 483.

Gleason fails to establish the first element of a *prima facie* case of retaliation (engaging in "protected expression") because she never reported her allegations of sexual

*tions, Inc.*, 957 F.2d 317, 320 (7th Cir.1992) (employer is "liable for . . . harassment only if the employer knew or should have known about an employee's acts of harassment and fail[ed] to take appropriate remedial action."); *see also Zimmerman v. Cook Co. Sheriff's Dept.*, 96 F.3d 1017, 1019 (7th Cir.1996) ("employer's duty to investigate and if appropriate take remedial measures is not activated until the employee complains of sexual harassment or information about the harassment comes to the employer's attention from some other quarter.").

harassment *during her term of employment with the defendant-appellee.* In order to demonstrate a case of retaliatory discharge, a plaintiff must show that she opposed conduct prohibited by Title VII, or at a minimum that she had a "reasonable belief" she was challenging such conduct. *Dey,* 28 F.3d at 1458. Gleason and others did complain about Novak's management style, in general terms. However, Gleason concedes that she did not raise the subject of sexual harassment to anyone in authority (including Novak and McGowan), and she admits that she neglected to follow the company's procedures for reporting sexual harassment. Gleason claims in her deposition testimony that she *"feels"* that Novak's objectionable behavior "encompassed ... sexual discrimination," but unless she made these "feelings" known to her employer, they are irrelevant. Based on this record, we hold that Gleason did not engage in statutorily-protected expression or activity *prior to her termination* and has thus failed to establish the "protected expression" element of retaliatory discharge.

Even if we were to assume that Gleason's generalized complaints about Novak could be construed as "protected expression," Gleason has failed to introduce evidence establishing the third required element of a *prima facie* case of retaliation: a "causal link" between her alleged "protected expression" and Mesirow's decision to terminate her employment. Nor is there any basis in the record for inferring that Gleason's termination was in any way linked to her previous complaints about Novak. In fact, there is evidence supporting a contrary inference, for Mesirow did *not* discharge any of the other employees who complained about Novak, not even Cassandra Armstrong, who acted as spokesperson for the complaining employees at one of their meetings. Gleason alone was terminated from her employment, not because she complained about Novak but because her failure to follow procedure and her repeated mistakes were costing the company so much money. We agree with the district judge's characterization of Gleason's causation argument as reasoning of the "post hoc ergo propter hoc" variety:

Ms. Gleason believes that the timing of events supports her causation argument. ... But while Ms. Gleason's termination came only a few weeks after she complained of Novak's conduct, this situation alone does not, looking at the totality of the circumstances, establish a reasonable inference of causation. Not only because it conveniently omits that Ms. Gleason's discharge followed even more closely on the heels of her significant and costly error of 2 November 1992 (which itself came closely on the heels of explicit warnings about the consequences of such errors), but [also because it] ignores the troublesome fact that no other complainers were dismissed.

We concur with the trial judge and hold that Gleason has failed to make out a *prima facie* case of retaliatory discharge; and thus we need not proceed with the *McDonnell Douglas* analysis. However, it should be obvious that Gleason's retaliation claim—if analyzed at greater length under the *McDonnell Douglas* framework—would founder on the very same rocks as the plaintiff's claim of pregnancy discrimination.[12]

## IV. CONCLUSION

The record amply supports the conclusion that Mesirow terminated Gleason because she failed to meet the firm's legitimate, job-related expectations. No reasonable trier of fact, based upon the record before us, could find that Gleason was a victim of either pregnancy discrimination or retaliatory discharge. As for the plaintiff's allegations of sexual harassment, we are not persuaded, for the reasons set forth, that Novak's alleged conduct rose to the level of actionable sexual harassment as defined in our case law. The entry of summary judgment in favor of the defendant-appellee is

AFFIRMED.

---

**12.** As discussed previously, we are convinced that Mesirow has come forward with legitimate, nondiscriminatory reasons for terminating Gleason that were not "pretextual."