Derrick **BICKERSTAFF**, an individual, Plaintiff,

v.

**NORDSTROM, INC.,** an Illinois corporation, Defendant.

No. 98 C 0070

United States District Court, N.D. Illinois, Eastern Division.

May 3, 1999.

John Reid Malkinson, Seth Robert Halpern, Malkinson & Halpern, P.C., Jason A. Fogg, Weiner & Associates, Scott P. Weiner, Chicago, IL, for Plaintiff.

James J. Oh, Jackie V. Iannicelli, Connelly, Sheehan & Moran, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

Before the Court is Defendant's Motion for Summary Judgment on Plaintiff's claims of discriminatory failure to promote and constructive discharge. For the following reasons, this Court grants the Defendant's Motion on both counts.

## BACKGROUND

Plaintiff Derrick Bickerstaff, an African-American, began working for Defendant Nordstrom, Inc., in May of 1994, as a stock worker in the Town Square department of Defendant's store in Oak Brook, Illinois. (Def.'s 12(M) ¶¶ 1, 3, 4.) The Town Square department sells women's clothing, including coats, dresses, business attire, and sportswear. (Affidavit of Mary Harmon ["Harmon Aff."] ¶ 2.) The Plaintiff's duties included inventorying stock, putting new stock on the showroom floor, and removing unsold stock from the floor. (Def.'s 12(M) ¶ 4.) At the time of his hiring, Plaintiff was paid $6.00 per hour; in October of 1994, he received a scheduled raise to $6.50 per hour. (Deposition of Derrick Bickerstaff ["Pl.'s Dep."] at 75, 76.)[1] In January of 1995, Plaintiff's pay was raised to $7.25 per hour; that raise was ahead of schedule. (Pl.'s Dep. at 76–77; Harmon Aff. ¶ 3.) Plaintiff's pay was then raised again, to $7.95 per hour, in June 1995. (Pl.'s Dep. at 77.) In November of 1995, Plaintiff was promoted to "lead stock worker" of the Town Square department; his new duties included supervising other stock workers in the department and assigning them tasks. (Def.'s 12(M) ¶¶ 6–7; Pl.'s 12(N) ¶ 38.) There were two full-time stock workers in the Town Square department, and one part-time stock worker. (Pl.'s Dep. at 88.) Subsequently, while he was still lead stock worker in the Town Square department, his pay was raised from $7.95 per hour to $9.10 per hour, a raise that was greater than he expected. (Pl.'s Dep. at 196.)

In April of 1996, Plaintiff was transferred to the position of "lead stock worker" at the Point of View department (a women's clothing sales department larger than Town Square) in Defendant's Oak Brook store. (Def.'s 12(M) ¶ 9.) Plaintiff was paid $9.35 per hour as lead stock worker of the Point of View department.

---

1. These, and other, facts are stated in Defendant's Local Rule 12(M) or Plaintiff's Local Rule 12(N) statements, or in the Exhibits attached to those statements.

(Pl.'s Dep. at 193.) Plaintiff was responsible for supervising three stock workers in that department, according to his supervisor, though Plaintiff alleges that he was responsible for supervising between seven and ten people. (Deposition of Cheryl Ciconte ["Ciconte Dep."] at 43; Pl.'s Dep. at 88.) His duties in that department included "second interviews" of job candidates, in which he had input into, though not authority over, hiring decisions. (Ciconte Dep. at 38.) He also had bookkeeping responsibilities, and continued overseeing other stock workers and delegating tasks; additionally, he was responsible for inventorying a warehouse. (Pl.'s Dep. at 89.) He did not write performance reviews for the stock workers in his department, however. (Def.'s 12(M) ¶ 10(d).) He also did not set the schedules for the workers in his department. (Def.'s 12(M) ¶ 10(h).) Plaintiff received the "Customer Service All–Star Award," an achievement recognized at a company luncheon, in June of 1996. (Def.'s 12(M) ¶ 12.) Twice, in the space of the 14 months he worked there, he asked for a raise; both times he was told that he was then earning the maximum available wage for a lead stock worker. (Pl.'s Dep. at 194–95.)

In October of 1995, Michael Principato, a Caucasian, began working full time in the Receiving and Delivery Department of Defendant's Oak Brook store.[2] (Def.'s 12(M) ¶ 36; Pl.'s 12(N) ¶ 7.) During his tenure at Oak Brook, the manager of the department, David Harpe, delegated significant responsibilities to Mr. Principato. (Def.'s 12(M) ¶ 37.) For example, Mr. Principato was in charge of setting up and taking down displays for special events in the store, helped manage the supplies, entered information into the computer terminal, and made and recorded payments to outside vendors. (Def.'s 12(M) ¶ 37.) Mr. Principato also communicated with the store's distribution center and determined where delivery trucks should be sent. (Def.'s 12(M) ¶ 38.) In December of 1996, Mr. Principato was promoted to Receiving and Delivery Manager for Defendant's Indianapolis store; subsequently, because the department at Oak Brook was shorthanded due to Mr. Principato's departure, Plaintiff helped load and unload trucks and deliver merchandise for that department for two weeks. (Def.'s 12(M) ¶¶ 40, 42.) Prior to that time, Plaintiff's experience in the Receiving and Delivery Department had been limited to occasionally helping load and unload the trucks. (Def.'s 12(M) ¶ 41.) Plaintiff alleges that David Harpe, Receiving Manager at the Oak Brook store, offered to teach Plaintiff computer skills relevant to a job in the Receiving and Delivery Department. Mr. Harpe denies making such an offer, however, and states only that Plaintiff indicated an interest in learning those skills. (Pl.'s Dep. at 187; Deposition of David Harpe ["Harpe Dep."] at 45; Affidavit of David Harpe ["Harpe Aff."] ¶ 3.)

In April of 1997, Michele Love, the Store Manager for Defendant in Oak Brook, decided to implement a centralized stock system in Oak Brook. (Affidavit of Michele Love ["Love Aff."] ¶ 4.) She decided that the new system would require a Stock Manager to oversee and coordinate the stock workers for the entire store. (Deposition of Michele Love ["Love Dep."] at 59; Love Aff. ¶ 3, 4.) Ms. Love compiled a list of four candidates for the new Stock Manager job, then narrowed the list to two: Plaintiff and Michael Barry, a Caucasian. (Love Aff. ¶ 5; Def.'s 12(M) ¶ 21; Pl.'s 12(N) ¶ 7.)

Back in October of 1996, Mr. Barry had become the "Stock Manager" of Defendant's store in Troy, Michigan, and had become responsible for overseeing that store's newly created centralized stock system.[3] (Def.'s 12(M) ¶ 17.) Mr. Barry was

---

**2.** Mr. Principato's mother and sister also work for Defendant. (Pl.'s 12(N) ¶ 59.)

**3.** The depositions supporting this assertion in Defendant's 12(M) statement refer to the position as "stock team lead." (Barry Dep. at 28, 36.)

paid $10.25 per hour in that position. (Deposition of Michael Barry ["Barry Dep."] at 28–29.) As Stock Manager, Mr. Barry supervised all the stock workers in the store except those in the shoe departments; he checked in and processed all the stock, coordinated all the stock work, prepared itineraries for all the workers (ranging in number from 10 to 18), monitored them during the day, and reviewed their time sheets. (Def.'s 12(M) ¶¶ 18–19.) Moreover, he independently hired stock workers, did performance reviews, disciplined workers, and had authority to fire them. (Def.'s 12(M) ¶ 19.) At first, he carried out his duties in conjunction with his immediate supervisor, but by early February of 1997, he had independent hiring and firing authority, as well as independent authority to review and discipline workers. (Def.'s 12(M) ¶ 19.)

Effective May 16, 1997, Mr. Barry was hired by Ms. Love as the new Stock Manager of Defendant's Oak Brook store.[4] (Pl.'s Dep. at 147; Def.'s 12(M) ¶¶ 20, 22; Love Aff. ¶ 6.) The Stock Manager position in Oak Brook entailed the same duties and responsibilities as the position that Mr. Barry had held in Troy. (Barry Dep. at 60.) Ms. Love states that she made the hiring decision because Mr. Barry had been doing the same job successfully in Troy. (Def.'s 12(M) ¶ 22.) Plaintiff alleges, and Ms. Love denies, that she told Plaintiff that Mr. Barry was hired because he was married to an employee of the Oak Brook store. (Pl.'s Dep. at 152; Love Dep. at 125–26.) Plaintiff also alleges that he complained that he felt the promotion was denied him due to his race. (Pl.'s 12(N) ¶ 71.)

In May of 1997, Michael Burks, an African–American, was promoted from Assistant Store Auditor to Support Systems Specialist. (Def.'s 12(M) ¶ 27.) Effective June 15, 1997, Plaintiff was promoted to Mr. Burks' old position of Assistant Store Auditor, a move that included a pay raise. (Def.'s 12(M) ¶ 29.) The responsibilities of the new position included reviewing documents sent to the Auditing Department by the sales departments and entering the information into a computer, reviewing audit reports, analyzing reports of merchandise transfers between stores, scanning barcodes, and writing memoranda regarding compliance with audits. (Def.'s 12(M) ¶ 30.) The Assistant Store Auditor position gave Plaintiff an opportunity to learn about other parts of Defendant's business and, potentially, to advance in the company. (Def.'s 12(M) ¶ 30.)

Plaintiff remained in the Assistant Store Auditor position for four days before resigning. (Pl.'s Dep. at 108, 110.) Plaintiff alleges that differences with his supervisor, Teresa Koltes, prompted his decision to resign. (Pl.'s Dep. at 110–11, 118–20.) For example, Plaintiff alleges that Ms. Koltes removed some resource materials on auditing from the Assistant Store Auditor's office before Plaintiff took the job, though Ms. Koltes denies that charge. (Pl.'s 12(N) ¶ 75; Affidavit of Teresa Koltes, Dec. 21, 1998 ["Koltes Aff."] ¶ 2.) While Plaintiff was working in that position, an e-mail intended for him regarding a meeting that he was expected to lead was misdirected to Ms. Koltes. (Pl.'s Dep. at 114–15.) Plaintiff also heard a comment from a clerical worker, Maggie Brewer, that he had not received the desired promotions because he was a "slave boy" or "errand boy"; Plaintiff believed that Ms. Brewer was a friend of Ms. Koltes. (Pl.'s Dep. at 120, 136.) Plaintiff voluntarily resigned from his job with Defendant on June 19, 1997. (Pl.'s Dep. at 108; Def.'s 12(M) ¶ 31.)

In October of 1997, Josh Norris, a Caucasian, was promoted to the position of "lead stock worker" for the entire Oak

---

4. The centralized stock system began operating on June 1, 1997. (Def.'s 12(M) ¶ 23.) Plaintiff spent approximately two weeks in May of 1997 helping to prepare for the implementation of the centralized stock system by assigning workers to different departments and checking in a variety of merchandise. (Pl.'s 12(N) ¶¶ 41, 42; Pl.'s Dep. 162, 167.)

Brook store.[5] (Pl.'s 12(N) ¶ 60; Barry Dep. at 86–88; Def.'s 12(M)(3) Response to Pl.'s 12(N) ["Def.'s 12(M)(3)"] ¶ 60.) As lead stock worker, Mr. Norris coordinated work among stock workers in different departments and spoke regularly with the managers. (Barry Dep. at 87.) Mr. Barry began to devote more attention to managerial responsibilities such as training sessions, setting schedules, and interviewing, and Mr. Norris coordinated the stock workers in different departments. (Barry Dep. at 87.) Mr. Norris was paid $10.25 per hour in that position. (Def.'s 12(M)(3) ¶ 31.)

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment should be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Materiality is determined by the substantive law: "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The movant bears the initial burden of showing that there is no genuine issue of material fact; if the movant meets that burden, the burden shifts to the non-movant to show, through specific facts in the record, that there is "a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Specifically, the non-movant must show evidence sufficient to support each element of the case which he or she will bear the burden of proving at trial. *Id.* at 322, 106 S.Ct. 2548. The court must, however, construe all facts in the light most favorable to the non-movant, and may not weigh credibility questions or draw inferences from the facts. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

A motion for summary judgment must include, under Local Rule 12(M) of the Northern District of Illinois, a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." United States Dist. Ct.Rules, N.D.Ill., General Rule 12(M)(3). The statement must consist of "short numbered paragraphs" supported by cites to "affidavits, parts of the record, and other supporting materials." United States Dist. Ct.Rules, N.D.Ill., General Rule 12(M)(3)(b). The non-movant's response, under Local Rule 12(N), must include "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references" to supporting materials, and "a statement . . . of any additional facts that require the denial of summary judgment. . . . All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." United States Dist. Ct.Rules, N.D.Ill., General Rule 12(N)(3). The non-movant's statements must also consist of short numbered paragraphs supported by cites to the record.

Evidence presented in support of or in opposition to summary judgment need not be in "a form that would be admissible at trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. However, to avoid summary judgment, the plaintiff must present "evidence of evidentiary quality—either admissible documents or attested testimony, such as that found in depositions or in affidavits—demonstrating the existence of a genuine

---

5. Mr. Norris's father was employed by Defendant at that time as an Operations Manager.

(Pl.'s 12(N) ¶ 60.)

issue of material fact." *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267 (7th Cir. 1994). Evidence is admissible on summary judgment if "a change in form but not in content, for example a substitution of oral testimony for a summary of that testimony in an affidavit, would make the evidence admissible at trial." *Winskunas*, 23 F.3d at 1268. But hearsay is inadmissible "to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir.1997). Evidence other than "depositions, answers to interrogatories, admissions and affidavits ... must be identified by affidavit or otherwise made admissible in evidence." *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir.1985). Other forms of evidence, without authentication, are inadmissible on summary judgment. *Id.*

## II. *Discriminatory Failure to Promote Standard*

■ Title VII of the Civil Rights Act of 1964 makes it illegal "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Disparate treatment may establish employment discrimination, but only upon a showing of intentional discrimination. *Gonzalez v.*

*Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1031 (7th Cir.1998).

■ Intentional discrimination may be shown either by direct or indirect evidence. *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir.1998). Under the first approach, the plaintiff can raise either direct or circumstantial evidence to show that there is a genuine issue of material fact supporting his claim. *Brill v. Lante Corp.*, 119 F.3d 1266, 1269 (7th Cir.1997); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). Under the second approach, the plaintiff can show intentional employment discrimination by indirect evidence. *Brill*, 119 F.3d at 1270. The "burden-shifting" approach to showing discrimination with indirect evidence was set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and has been adapted slightly for failure-to-promote cases.[6] *See, e.g., Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir.1998). Plaintiff's argument rests upon circumstantial and indirect evidence; accordingly, this Court will analyze his claim under those theories.

### A. **Circumstantial Evidence** (*Troupe*)

■ Circumstantial evidence, if sufficiently persuasive, may defeat a motion for summary judgment on a Title VII claim. *Troupe*, 20 F.3d at 736. *Troupe* identified three types of circumstantial evidence: the first is "bits and pieces from which an

---

6. *Troupe's* direct, yet "circumstantial evidence" and *McDonnell Douglas'* "indirect evidence" overlap substantially and the logic of having two independent and slightly differing approaches to weighing employment discrimination claims may fairly be questioned. *See Brown v. Runyon*, 2 F.Supp.2d 1062, 1067 n. 8 (N.D.Ill.1998) (this Court's discussion of *Troupe* and *McDonnell Douglas*); *see also Murawski v. Tri Serv. Inc.*, 36 F.Supp.2d 1041, 1045 (N.D.Ill.1999). The Seventh Circuit has recognized the overlap. *See Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir.1997). The Seventh Circuit has also criticized *Troupe's* definition of direct evidence, stating that such evidence may not rely on " 'inference or presumption.' " *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 443 (7th Cir.1997) (quot-

ing *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.1997)). Nevertheless, more recent Seventh Circuit decisions have applied the *Troupe* standard. *See Council 31, Am. Fed'n of State, County and Mun. Employees, AFL—CIO v. Doherty* 169 F.3d 1068, 1072 (7th Cir.1999); *Marshall v. American Hosp. Ass'n*, 157 F.3d 520, 526 (7th Cir.1998); *Pafford v. Herman*, 148 F.3d 658, 665–67 (7th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 548, 142 L.Ed.2d 455 (1998). This Court, therefore, finds that *Troupe* remains good law. Since much of Plaintiff's evidence is circumstantial under *Troupe's* definition, this Court applies that test here (in addition to *McDonnell Douglas'* test) once again noting the confusion among the courts.

inference of discriminatory intent might be drawn," including "suspicious timing, ambiguous statements ... [and] behavior toward[s] or comments directed at other [members of] the protected group" that create a "mosaic of discrimination." *Id.* at 736–37. The second type is "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff [but not in the protected group] ... received systematically better treatment." *Id.* The last is "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Troupe*, 20 F.3d at 736–37. Each type is reviewed in turn.

### 1. *"Bits And Pieces"*

■ The "mosaic of discrimination" under *Troupe*'s analysis can consist of many different kinds of evidence, as indicated above, but Plaintiff does not allege enough of them to satisfy this factor. "Suspicious timing," for instance, refers to instances where an employee is discharged not long after his membership in a protected group becomes an issue: the employee requested special accommodation for a disability, for example, or complained about disparate treatment. *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1034 (7th Cir.1999); *Adusumilli v. City of Chicago*, 164 F.3d

353, 363 (7th Cir.1998). But Plaintiff's alleged complaint of racial bias, which Defendant denies, came approximately a month after Mr. Barry had begun working in the Stock Manager job. (Pl.'s 12(N) ¶ 71; Love Dep. at 124.) Since Plaintiff's alleged complaint is the only occasion he mentions where his race became an issue on the job, and since the complaint came after the hiring decision was made, there is no "suspicious timing" at issue here.

■ Ambiguous statements, for purposes of showing discrimination by circumstantial evidence, refer to "isolated comments" supporting an inference of discrimination, even if they do not directly indicate racial animus. *Marshall*, 157 F.3d at 526. Such statements, however, need to be "contemporaneous" with the adverse employment decision. *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir.1997). The only such comment that Plaintiff mentions is the "slave boy" remark, which is inadmissible hearsay:[7] it is not admissible for its truth, namely that Defendant's management regarded Plaintiff as a "slave boy" and did not intend to promote him.[8] Even if it were admissible, that statement is hardly probative of discriminatory intent or racial animus: it was not contemporaneous with Plaintiff's failure to secure the desired promotions, and Plaintiff alleges no causal relation between that and the failure to promote. Moreover, the source of the comment was a

---

7. Though Ms. Brewer was an employee of Defendant at the time of the alleged remark, the statement does not come within the party admission exception to the hearsay rule as stated in Federal Rule of Evidence 801(d)(2)(D), which provides that a statement is not hearsay if "[t]he statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Statements are outside of the scope of the declarant's employment when they concern decisionmaking processes into which the declarant has no input. *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 950–51 (7th Cir.1998). Absent a showing that making decisions about Plaintiff's promotions was part

of Ms. Brewer's employment, the statement is not a party admission.

8. Sworn statements in affidavits may, of course, be admissible as evidence on summary judgment motions. But Ms. Brewer did not sign an affidavit; the only account of her alleged statement comes from Plaintiff. Since her statement to Plaintiff is supposedly based on yet another alleged out-of-court statement by Teresa Koltes, and neither declarant has testified in a deposition or signed an affidavit, none of the matters therein are admissible for their truth. Plaintiff may offer them for other purposes, such as their effect on him, but the statements' effects on him are not relevant to his discrimination claim.

clerical worker who had no decision-making authority regarding Plaintiff's promotions, and the friendship that Plaintiff alleges between that worker and Plaintiff's supervisor does not even begin to prove that the statement reflected his supervisor's attitude.[9]

Finally, Plaintiff has not alleged biased behavior on the part of Defendant toward other African–American workers; indeed, Plaintiff acknowledges that his predecessor in the Assistant Store Auditor position, an African–American, was promoted to Systems Support Specialist. (Pl.'s 12(N)(3)(a) ¶ 27.) Plaintiff, therefore, has offered no evidence of this type to support his claim.

The other incidents that, Plaintiff alleges, indicated racial bias among Defendant's management are likewise unpersuasive. Asked the basis for his belief that Ms. Koltes, his supervisor in the audit department, harbored racial animus, Plaintiff cited her repeated assurance that he would get the Stock Manager job. (Pl.'s Dep. at 128–29.) Similarly, when asked the basis for his claim that he experienced discrimination while in the audit department, Plaintiff referred to the incidents of the misdirected e-mail and the missing resource materials. (Pl.'s Dep. at 128.) Plaintiff also alleges that Mr. Harpe offered to help teach him to use a computer terminal and did not keep that promise. (Pl.'s Dep. at 187.) Even when these facts are construed in the light most favorable to Plaintiff, they do not add up to intentional discrimination on Defendant's part. An e-mail mixup, a cleaned-out office, and a broken promise are too thin a thread on which to hang intentional racial discrimination. *Troupe*'s "bits and pieces" evidence, therefore, does not provide circumstantial evidence sufficient to defeat Defendant's motion.

### 2. *Disparate Treatment*

■ Plaintiff may also furnish circumstantial evidence of intentional discrimination by demonstrating that similarly situated employees who were not African–American received more favorable treatment. Plaintiff's evidence on this point is insufficient to justify that contention, however. Plaintiff marshals a variety of statistics purporting to show that Defendant's hiring rates of African–Americans for management positions are substandard, which, Plaintiff argues, itself constitutes evidence of discrimination. (Pl.'s Memorandum in Opposition to Summary Judgment ["Pl.'s Mem.Opp."] at 10–11.) However, Plaintiff establishes no foundation for his statistics; he merely furnishes numbers on a page, with no supporting affidavit to show what the numbers mean. (Pl.'s 12(N), Ex. M.) The statistical evidence is therefore inadmissible for purposes of the summary judgment motion. Moreover, even if it were admissible, it is not relevant for purposes of showing that non–African–Americans similarly situated to Plaintiff were treated better than he, since Plaintiff makes no showing that Defendant has ever hired a Caucasian over an African–American when the two candidates were similarly situated.

Plaintiff also contends that two Caucasian employees that were similarly situated to him, Mr. Norris and Mr. Barry, were paid more. Mr. Norris was not, however, similarly situated: he held the position of "lead stock worker" for the entirety of the Oak Brook store, a position that Plaintiff never held. (Def.'s 12(M)(3) ¶ 60.) Moreover, he assumed that position approximately four months after Plaintiff left the store. Even if the pay scale in effect during Plaintiff's employ was still in force when Mr. Norris took that position, which is unclear, Plaintiff has not shown how it applied to the new position of "lead stock worker" for the entire Oak Brook store,

---

**9.** The alleged friendship rests on Plaintiff's assertion, not on any testimony by either of the supposed friends.

since the pay scale went into effect on December 1, 1996, before the centralized stock system was implemented. (Pl.'s 12(N) Ex. P–4; Def.'s 12(M) ¶ 23.) Likewise, the fact that Mr. Barry was paid $10.25 per hour as the stock team lead in Troy does not show differential treatment, as the job Mr. Barry held in Troy is one that Plaintiff never held in Oak Brook. Plaintiff cannot, therefore, show differential treatment for similarly situated non–African–American employees.

### 3. *Qualified But Passed Over*

To demonstrate circumstantial evidence of intentional discrimination through the third approach, Plaintiff must show that he was qualified for the desired positions but passed over in favor of employees who were not African–American, and that Defendant's reasons for that decision were pretextual and "unworthy of belief." *Troupe,* 20 F.3d at 736. This Court will analyze Defendant's failure to promote Plaintiff to both the Stock Manager and Receiving Manager positions.

### a. *Stock Manager*

Defendant admits that Plaintiff was qualified to work as the Stock Manager of the Oak Brook store. (Def.'s 12(M)(3) ¶ 1.) Defendant contends, however, that Mr. Barry was more qualified to hold that position. (Def.'s Mem. of Facts and Law in Support of Mot. for Summary Judgment ["Def.'s Mem.Supp."] at 8.) As discussed below, that contention is well supported by the evidence. Moreover, Plaintiff must show that Defendant's reasons are pretextual, but his main contention regarding pretext, apart from the argument that Plaintiff was in fact more qualified than Mr. Barry, is that Ms. Love did not adequately investigate Mr. Barry's qualifications before hiring him. (Pl.'s Mem.Opp. at 13–14.) The record reflects, however, that Ms. Love discussed the new position with Mr. Barry and spoke with his store manager about his work in the store at Troy. (Def.'s

12(M) ¶ 20; Love Dep. at 82–83.) Employers may decide for themselves on how much investigation is appropriate before hiring or promoting employees, and absent obviously suspect practices, this Court will not tell Defendant how to manage its hiring and promotion. The Seventh Circuit has said as much: " 'No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers,' the laws barring discrimination do not interfere," provided that the employer honestly believes in its proffered (legitimate, nondiscriminatory) reasons. *Kariotis v. Navistar Int'l Transp. Corp.,* 131 F.3d 672, 678 (7th Cir. 1997) (quoting *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992)). *See also Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir. 1986) (a court does not "sit as a super-personnel department that reexamines an entity's business decisions"); *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1399 (7th Cir.1997) (an employer's true basis for an employment action may be "embarrassing" or "invidious" and yet not discriminatory).

Plaintiff also complains that Defendant's "practice of . . . neither posting nor advertising its management openings" and "closed-door management decisions" are "inherently discriminatory." (Pl.'s Mem. Opp. at 1.) Plaintiff has provided no evidence, however, to support his assertion that these hiring practices disproportionately impact African–Americans, and as such the argument is unpersuasive.

Finally, Plaintiff alleges that Ms. Love told him that Mr. Barry received the promotion to Stock Manager at Oak Brook because he was married to another employee at that store, when in fact the two were merely engaged at that time. Plaintiff argues that the evidence regarding Mr. Barry's engagement, and Ms. Love's alleged statement about it, demonstrate the pretextual nature of Defendant's reasons for promoting him. (Pl.'s Mem.Opp. at 9,

14.) The significance of these alleged events for Plaintiff's argument is unclear, however, and none of the conclusions that he tries to draw support his case.

Plaintiff essentially alleges that Ms. Love lied to him about two matters—Mr. Barry's engagement and the reasons for hiring Mr. Barry—and, for the purposes of clarity, the Court will address those two alleged lies separately. In regard to Ms. Love's supposed statement that Mr. Barry was married, rather than engaged, Plaintiff has not shown that she lied; even viewing all the facts in the record in the light most favorable to Plaintiff, he has only shown that she was wrong when she told Plaintiff that Mr. Barry was married to an Oak Brook employee. Plaintiff has not shown that Ms. Love knew that Mr. Barry and his fiancee were merely engaged. If an employee making hiring decisions honestly believes that the decisions are based on nondiscriminatory reasons, the reasons are not pretextual. *Brill,* 119 F.3d at 1270. The reasons need not be compelling; they can be "foolish or trivial or even baseless." *Id.* Plaintiff has presented nothing to suggest that Ms. Love did not honestly believe what she said about Mr. Barry. Furthermore, even assuming *arguendo* that Ms. Love knew that Mr. Barry was engaged, rather than married, the distinction is trivial and has no bearing on the case. Plaintiff has not shown how that alleged lie relates to racial discrimination.

As for the second alleged falsehood—the claim that the decision turned on Mr. Barry's family connections rather than his qualifications—the significance of that is debatable. Plaintiff does not clearly explain how such a lie could indicate racial discrimination, though he may be arguing that any lie must indicate sinister dealings. But there are some situations where a lie is indicative less of malice than of a desire to ameliorate a difficult situation; a manager having to explain to an employee why he did not receive a desired promotion is one such situation. Telling Plaintiff that

Mr. Barry's personal connections made the difference, even if untrue, might have been more palatable to Plaintiff than simply telling him that Mr. Barry was more qualified. Not every lie can justifiably be considered evidence of culpable motives in discrimination cases, even if the lie is related to the employment decision. *See Rabinovitz v. Pena,* 89 F.3d 482, 488 (7th Cir.1996) (an employer's false statement about not knowing an employee's religion at the time of discharge does not establish pretext, since there are other potential explanations for the statement; the plaintiff must demonstrate a connection between the alleged lie and the employment decision).

Plaintiff complains of the "obvious deference given to candidates that have friends or family in the company," pointing to Mr. Barry, Mr. Principato, and Mr. Norris, and claims that pervasive nepotism can establish disparate racial impact. (Pl.'s Mem.Opp. at 9.) But Plaintiff furnishes no evidence to show that these or any other employees were hired because of nepotism, and three instances do not compel an inference that Defendant systematically favors employees with personal connections. Moreover, assuming *arguendo* that Plaintiff's account is accurate and that Ms. Love told him that Mr. Barry's family situation was crucial to the hiring, that does not necessarily give rise to an inference of racial discrimination. Rather, this Court would logically infer that the decision was based on nepotism, and nepotism, while disreputable, is not illegal. *Wallace,* 103 F.3d at 1399. The Court notes that the two Fourth Circuit cases that Plaintiff cites for the proposition that nepotism perpetuates racial bias are not controlling authority. (Pl.'s Mem.Opp. at 9.)

Finally, Plaintiff's claim that Ms. Love told him that Mr. Barry's family connections were a factor in his hiring does not defeat Defendant's argument that Mr. Barry was hired because of his superior qualifications. To show pretext, Plaintiff must show that all of Defendant's pur-

ported reasons for the decision are lies. *Brill,* 119 F.3d at 1270. Defendant asserts that it promoted Mr. Barry because he was better qualified than Plaintiff. Plaintiff does not claim that Ms. Love admitted that Mr. Barry was not better qualified than Plaintiff; he claims only that she said that Mr. Barry was hired because of his family situation. (Pl.'s Dep. at 152.) Plaintiff provides no other evidence to show that Defendant's purported reasons for the decision were lies. If "at least one" of Defendant's reasons for not promoting Plaintiff "stands unquestioned," Plaintiff cannot defeat summary judgment by introducing evidence of other reasons. *Russell v. Acme–Evans Co.,* 51 F.3d 64, 69 (7th Cir.1995). Accordingly, Plaintiff has not shown through circumstantial evidence that Defendant's failure to promote him to the Stock Manager job was discriminatory.

### b. *Receiving Manager*

Plaintiff contends that he was qualified for the Receiving Manager position in Indianapolis, and that Defendant's reasons for hiring Mr. Principato were pretextual. However, as discussed below, the manifest weight of the evidence shows that Mr. Principato was vastly better qualified than Plaintiff for the Receiving Manager job. As Plaintiff makes no showing, other than the general arguments discussed and rejected above, that Defendant's reasons for promoting Mr. Principato were pretextual, Plaintiff has not established that Defendant's failure to promote him to the Receiving Manager job was discriminatory.

### B. **Indirect Evidence** (*McDonnell Douglas*)

 Intentional discrimination for purposes of Title VII may also be shown through indirect evidence under the *McDonnell Douglas* framework. *Plair,* 105 F.3d at 347. Under that approach, Plaintiff first must make a *prima facie* case of discrimination, meaning that he must show that "(1) [he] applied for a promotion; (2)[he] was entitled to the pro-

motion; and (3) the individual promoted had the same or lesser qualifications." *Bragg,* 164 F.3d at 377. If Plaintiff makes a *prima facie* case, the burden shifts to Defendant to show legitimate nondiscriminatory reasons for the non-promotion; if Defendant does that, the burden shifts back to Plaintiff to show that Defendant's reasons are pretextual. *Brill,* 119 F.3d at 1270. The Court reviews each factor in turn, for both the Stock Manager and Receiving Manager positions.

### 1. *Stock Manager*

Defendant has already conceded that Plaintiff was qualified for the position, and to the extent that employees at Defendant apply for promotions, Plaintiff applied by discussing the job with his supervisor. But Plaintiff has not shown that Mr. Barry had the "same or lesser qualifications" for the Stock Manager job. Mr. Barry's position as lead stock worker in Troy entailed responsibilities that Plaintiff had not encountered before: for example, Mr. Barry had independent authority to hire, fire, and discipline. He also coordinated the work done by stock workers in most of the store, did formal performance evaluations, and prepared workers' schedules. (Def.'s 12(M) ¶¶ 18, 19.) Mr. Barry held the job for seven months, and had independent authority over management-related decisions for three months. (Def.'s 12(M) ¶¶ 17, 19, 23.) Certainly, Plaintiff had been working full time in Defendant's employ for longer than that, but more experience as a stock worker does not, in itself, qualify Plaintiff for the Stock Manager position. Moreover, Mr. Barry had seven months' experience running a centralized stock system, and had run that system in Troy since its inception; Plaintiff's two weeks at Oak Brook, implementing the system there, are hardly equivalent. (Def.'s 12(M) ¶ 17; Pl.'s 12(N) ¶ 41.) In addition, Plaintiff's supervisor had concerns about his capacity to fulfill certain responsibilities of the Stock Manager position, specifically firing employees with

whom he was friendly. (Ciconte Dep. at 71.) Plaintiff had been responsible for no more than ten stock workers at Oak Brook,[10] whereas Mr. Barry had been responsible for between ten and 18. (Ciconte Dep. at 43; Def.'s 12(M) ¶ 18.) In light of those differing burdens, it is irrelevant that the Oak Brook store is larger than the Troy store. (Pl.'s 12(N) ¶¶ 29, 50.)

Plaintiff also contends that the statistical evidence (discussed earlier at 19) can make a *prima facie* case for discrimination. (Pl.'s Mem.Opp. at 10.) The evidence that Plaintiff cites is inadmissible for lack of foundation, however, as has also been discussed above. Moreover, even assuming that the evidence is admissible, Plaintiff cites no controlling authority for the proposition that numerical disparities can establish a discriminatory failure to promote an individual. (Pl.'s Mem.Opp. at 10.) Plaintiff cites *Stewart v. General Motors Corp.*, 542 F.2d 445 (7th Cir.1976), but that was a class action, not an individual complaint. Clearly, statistics have considerable weight when they show disparate treatment of an entire class, but their probative value for demonstrating discrimination against an individual is low.[11] *McDonnell Douglas*, which Plaintiff also cites, states that statistical evidence "may be helpful" in determining whether purported reasons for employment decisions are pretextual; the *McDonnell Douglas* Court does not say that statistical evidence can "directly establish" anything, and does not address the relevance of statistics to a plaintiff's *prima facie* case. 411 U.S. at 805, 93 S.Ct. 1817. Moreover, that decision warns that "[findings on the racial composition of the workforce], while helpful, may not be in and of themselves controlling as to an individualized hiring decision, particularly in the presence of an otherwise justifiable reason. . . ." 411 U.S. at 805 n. 19, 93 S.Ct. 1817.[12]

Furthermore, the weight of Seventh Circuit authority holds that statistics are not, by themselves, sufficient to establish discrimination, whether intentional or unintentional. *See, e.g., McNamara v. City of Chicago*, 138 F.3d 1219, 1223 (7th Cir.) ("almost any occupation in the United States will reveal disparities, often stark, between the racial, ethnic, religious, and sexual composition of the occupation and that of the American population in general, and not all of these disparities are plausible attributable to intentional, or for that matter unintentional, discrimination."), *cert. denied,* —— U.S. ——, 119 S.Ct. 444, 142 L.Ed.2d 398 (1998). *See also Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940,

---

**10.** Plaintiff's testimony on this point is contradicted by that of his supervisor, Ms. Ciconte. Plaintiff stated that there were between seven and ten workers in his department, while Ms. Ciconte stated that there were three. (Pl.'s Dep. at 88; Ciconte Dep. at 43.) However, assuming *arguendo* that Plaintiff did manage between seven and ten stock workers, that is still not comparable to Mr. Barry's experience.

Plaintiff also alleges, and Defendant denies, that there were sometimes more than 15 people in the Point of View department. (Pl.'s 12(N) ¶ 88; Def.'s 12(M)(3) ¶ 46.) Plaintiff furnishes no evidence, however, regarding how often this happened, how long those conditions would last, and what his responsibilities regarding the extra workers were. That assertion is not, therefore, sufficient for this Court to find that Plaintiff's experience in managing large stock teams was comparable to Mr. Barry's.

**11.** The Supreme Court has stated that "[i]t is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for each applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force." *Furnco Constr. Co. v. Waters*, 438 U.S. 567, 579, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). The *Furnco* Court acknowledged that "[w]e cannot say that [statistical evidence] would have absolutely no probative value" in deciding whether individual decisions were racially motivated, but noted that such evidence is not sufficient to decide the question. *Id.* at 580, 98 S.Ct. 2943.

**12.** The *Watson v. Fort Worth Bank* concurrence that Plaintiff cites is not controlling authority. 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (Blackmun, J., concurring).

942 (7th Cir.) (statistical evidence must "correct" for any potentially benign or explanatory factors before it can be used to support an inference of discrimination), *cert. denied,* 521 U.S. 1104, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997).

Plaintiffs' other contentions regarding his and Mr. Barry's relative qualifications, such as the fact that Plaintiff helped Mr. Barry during his first few weeks at Oak Brook, have little weight. Plaintiff argues, in addition, that Mr. Barry's work in the Stock Manager position at Oak Brook was unsatisfactory and that Plaintiff would have done better work in that position, but bolsters this argument with conclusory assertions and unsupported lay opinions in affidavits, and accordingly this contention is not persuasive. (Pl.'s 12(N) ¶ 57; Affidavit of Sean Chapman ["Chapman Aff."] ¶¶ 9, 10.) *See Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 887 (7th Cir. 1998). Moreover, Mr. Barry's poor performance, even if proven, would not establish that Plaintiff was as qualified as he; since Plaintiff never held the position, there is no evidence that he would have outperformed Mr. Barry. Plaintiff has not shown that the Stock Manager position went to a non–African–American employee of equal or lesser qualifications; Plaintiff cannot, therefore, make a *prima facie* case of discrimination. Accordingly, this Court does not reach the final two steps of the *McDonnell Douglas* analysis.[13]

### 2. *Receiving Manager*

Defendant does not concede, in its pleadings, that Plaintiff was qualified for the Receiving Manager position. (Def.'s Mem.Supp. at 10.) Ms. Love appears to concede in her deposition that Plaintiff was qualified for that position, but the context—Ms. Love answered only after a lengthy objection that changed the form of the question—makes it unclear what exactly she was conceding. (Love Dep. at 108–

09.) The Receiving Manager job entailed paying and keeping track of invoices, keeping a checkbook, communicating with the distribution center, hiring and firing employees, setting up and taking down displays, ordering supplies, anticipating changes in store volume and adjusting labor schedules accordingly, and other duties, none of which Plaintiff had done. (Harpe Dep. at 33–34.)

Even assuming, *arguendo,* that Plaintiff was qualified for the job, Mr. Principato was far better qualified. He had worked full-time in the Receiving Department for more than a year; the Receiving Manager at Oak Brook called Mr. Principato his "point man" for setting up and taking down displays for special events. (Harpe Dep. at 60.) He had already performed many of the responsibilities of a Receiving Manager while at Oak Brook, and was familiar with Defendant's policies and practices regarding receiving. (Harpe Aff. ¶ 9.) As Plaintiff had never worked full-time in the Receiving Department, and as his experience at the time Mr. Principato was promoted was limited to occasional help unloading trucks, the evidence does not support his claim that he was qualified for the job. Plaintiff, therefore, cannot make a *prima facie* case for discriminatory failure to promote in regard to the Receiving Manager job, and has not established a genuine issue of material fact.

### C. Conclusion

Plaintiff has not shown, by direct, circumstantial, or indirect evidence, a genuine issue of material fact indicating that Defendant's failure to promote him to the positions that he wanted was based on intentional racial discrimination. This Court, therefore, grants summary judgment to Defendant on those claims.

### III. *Constructive Discharge*

 Plaintiff's final contention is that his move to the Assistant Store Audi-

---

**13.** Many of the factors pertinent to the remaining steps of the *McDonnell Douglas* test have, furthermore, already been addressed under the *Troupe* "circumstantial evidence" test.

tor position in June of 1997 was a constructive discharge. For constructive discharge, the following is required: "(1) the conditions at work were so intolerable that a reasonable person would have been compelled to resign; and (2) the working conditions must be intolerable in a discriminatory way." *Bragg*, 164 F.3d at 377. Working conditions are intolerable if "a reasonable employee would have concluded that the conditions made remaining in the job unbearable." *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir.1998). A failure to promote is not itself sufficient for constructive discharge, even if that failure is discriminatory. *Id.* at 956. If the employer has an "up or out" policy, under which employees who do not advance are, in effect, discharged, the situation may be different. *Id.* But Plaintiff has furnished no evidence to show that Defendant had such a policy.

A reasonable employee would hardly have concluded that the Assistant Store Auditor position constituted intolerable working conditions. In fact, Plaintiff admits that the position was a *promotion.* (Def.'s 12(M) ¶ 29; Pl.'s 12(N)(3)(a) ¶ 29.) He contends that the position was "watered-down," meaning that he did not have as many responsibilities and duties as Mr. Burks, his predecessor. (Pl.'s 12(N) ¶ 72; Pl's 12(N)(3) ¶ 30.) The record does not support that contention, however; Plaintiff testified in his deposition only that, in his four days on the job, he was not asked to perform all the tasks that Mr. Burks had done. Moreover, Plaintiff does not specifically deny, and therefore admits, that the Assistant Store Auditor position had a wide variety of duties. (Def.'s 12(M) ¶ 30; Pl.'s 12(N)(3) ¶ 30.) It would be surprising if Plaintiff had, within four days, assumed all of the responsibilities of his new position.

The standard for intolerable conditions, moreover, requires discomfort well beyond what Plaintiff alleges. Working conditions not found intolerable for purposes of constructive discharge, include, for example, obnoxious co-workers who interfered with the complainant's work by logging her off her computer and taking over her cubicle without permission. *Lindale*, 145 F.3d at 954. Other conditions not found intolerable include an office workplace where the other employees persistently "shunned" the complainant, walking out of the room when he arrived, and another where the complainant was subjected to various sexual comments and suggestive references. *Drake*, 134 F.3d at 882; *Skouby v. Prudential Ins. Co. of Am.*, 130 F.3d 794, 796, 798 (7th Cir.1997). The incidents that Plaintiff alleges—an office that was cleaned out, a misdirected e-mail—hardly constitute deliberate harassment or hostile treatment of this sort; Plaintiff gives no reason to believe that the e-mail mixup was deliberate, and a cleaned-out office might naturally occur when employees change jobs.

Plaintiff's working conditions as Assistant Store Auditor, were not intolerable, hence this Court need not address the question of whether those conditions were intolerable in a discriminatory way. Plaintiff has, therefore, not shown a genuine issue of material fact on his claim of constructive discharge from Defendant's employ, and this Court grants Defendant summary judgment on that claim.

### CONCLUSION

For the foregoing reasons, there is no genuine issue of material fact with respect to any of Plaintiff's claims. Defendant is entitled to summary judgment as a matter of law on all counts of Plaintiff's Complaint.

**IT IS THEREFORE ORDERED** that:

Summary Judgment be, and the same hereby is, **GRANTED,** in favor of Defendant and against Plaintiff.